**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02139-NYW

TAMMY L. DUNLAP,

      Plaintiff,

v.

CAROLYN W. COLVIN,

      Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

Magistrate Judge Nina Y. Wang

      This civil action arises under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34 (2012) for review of the Commissioner of Social Security's final decision denying Plaintiff Tammy L. Dunlap's ("Plaintiff" or "Ms. Dunlap") application for Disability Insurance Benefits ("DIB"), and is before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c). [#16, dated December 3, 2015].[1]  After carefully considering Plaintiff's Opening Brief [#18], Defendant's Response Brief [#19], Plaintiff's Reply Brief [#20], the entire case file, the Administrative Record, and the applicable case law, this court respectfully REVERSES the Commissioner's decision and REMANDS for further proceedings.

---

[1] For consistency and ease of reference, this Order utilizes the docket number assigned by the Electronic Court Filing ("ECF") system for its citations to the court file.  For the Administrative Record, the court refers to the page number associated with the Record, which is found in the bottom right-hand corner of the page.  For documents outside of the Administrative Record, the court refers to the page number assigned in the top header by the ECF system.  Where the court refers to the filings made in the ECF system in this action, it uses the convention [#___].

**PROCEDURAL HISTORY**

This case arises from Plaintiff's application for DIB based on bipolar disorder, back impairment, migraines, obesity, depression, and hiatal hernia. [#12-5 at 129; #12-6 at 150; #18 at 1]. Ms. Dunlap's extensive medical record indicates a significant history of both mental and physical ailments. Beginning with her mental ailments, Ms. Dunlap was initially diagnosed with manic depressive disorder in 1991, [#12-2 at 39; #12-9 at 403], and diagnosed with anxiety and bipolar disorder in 2008, following a mental breakdown that required hospitalization at Porter Adventist Hospital in Denver, Colorado. [#12-2 at 39; #12-9 at 403]. In addition, Ms. Dunlap's medical records indicate that the she was diagnosed with varying degrees of migraine headaches: Migraine without aura in December 2005; Migraine with aura and without status migrainous, not intractable[2] in March 2006; and Migraine without status migrainous, not intractable in August 2009. *See generally* [#12-8 at 287, 235, 278, 290, 294, 397; #12-12 at 695, 707–710, 807–810, 822].[3]

Physically, Ms. Dunlap is five feet and seven inches tall, weighing approximately 220 pounds—a Body Mass Index ("BMI") of 30.35.[4] *See* [#12-8 at 286, 297; #12-9 at 360, 365, 374]. In 2002, however, Plaintiff had gastric bypass surgery, and over the following two years dropped her weight from 317 pounds to 138 pounds, but since 2008, Plaintiff has regained a

---

[2] An "intractable headache" refers to headaches that are constant and unrelenting, despite treatment. *See Intractable Headache*, AMERICAN MIGRAINE FOUNDATION, https://americanmigrainefoundation.org/living-with-migraines/types-of-headachemigraine/intractable-headache/ (last updated May 14, 2014).

[3] Ms. Dunlap's history of frequent migraines is rather extensive, and is discussed in much greater detail below.

[4] For adults, a BMI of 30 or above is categorized as obese. *See About Adult BMI*, Center for Disease Control and Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html (last updated May 15, 2015).

majority of the lost weight.  *See* [#12-2 at 40–41; #12-8 at 244–245].  In 2010, Plaintiff was treated for chronic foot pain, [#12-7 at 193], and a March 2011 X-ray revealed posterior and plantar calcaneal osteophytes and plantar grade navicular cuneiform joints.  [#12-8 at 231–234]. In August 2011, Plaintiff was again treated for continued foot pain, and diagnosed with plantar fascial fibromatorsis, achilles tendinitis, and leg pain.  [*Id.* at 238–239].  Due to continued pain and the failure of conservative treatments, Ms. Dunlap underwent a "gastrocnemius recession and reset posterior heel spur with re-attached achilles tendon as needed" on October 26, 2011. [*Id.* at 256–276 (detailing the surgery procedures, as well as post-operative rehabilitation plans].

In addition to chronic foot pain, Plaintiff also alleges severe physical impairments because of her back pain.  [#12-6 at 150–151; #12-10 at 484 (noting her back pain)].  Ms. Dunlap presented to the Emergency Room ("ER") on September 1, 2011, complaining of severe back pain, stemming from a February 2011 spinal lumbar puncture, with bending and lifting exacerbating the pain.  [#12-8 at 235, 240].  In May 2012, Ms. Dunlap visited her primary care physician, Ms. Madelyn S. Palmer, M.D., because of worsening back pain, and indicated that she received injections of pain medication in March of that year that had now worn off.  [#12-9 at 380–381].  Then, on August 9, 2012, and again on November 5, 2012, Ms. Dunlap underwent additional procedures for vertebrae joint injections with the use of fluoroscopic guidance to help ease her pain.  [#12-8 at 289–93 (detailing the August procedure), 307–310 (detailing the November procedure)].  Also in 2012, Ms. Dunlap began complaining of abdominal pain and nausea.  [*Id.* at 296].  A computerized tomography ("CT") scan revealed that Ms. Dunlap suffered from a hiatal hernia, and on October 4, 2012, had surgery to repair this issue.  [#12-7 at 211–212; #12-8 at 296, 298–300 (surgery procedural notes), 304–307 (pre-surgery report)]. Unfortunately, the surgery did not alleviate Ms. Dunlap's symptoms.  *See* [#12-8 at 311].

3

Ultimately, Plaintiff alleges that the combination of her ailments and the side effects of her medications rendered her unable to work. *See* [#12-6 at 173 (explaining that her medications and ailments render her an "[un]reliable employee")].

On September 24, 2012, Ms. Dunlap filed an application for DIB under Title II of the Act, alleging disability beginning on January 1, 2011. [#12-3 at 65; #12-5 at 129; #12-6 at 150; #18 at 1]. Prior to filing for DIB, Ms. Dunlap worked as an Administrative Assistant for various companies for approximately eight years, she worked as a Recruiter for approximately a year and, most recently, she worked as a licensed Home and Hospital Health Care Certified Nurse's Assistant ("CNA") for four years. [#12-2 at 55; #12-6 at 151–152, 158]. As an Administrative Assistant and Recruiter, Ms. Dunlap sat for a majority of her day and did not have to lift more than ten pounds frequently. [#12-6 at 162–166]. Conversely, Ms. Dunlap's work as a CNA was much more strenuous, requiring her to kneel, crouch, and write for seven-plus hours per day; to walk, stand, and handle large objects for three-plus hours per day; and to lift between 50-100 pounds frequently. [*Id.* at 159–161]. However, due to her physical and mental ailments, most notably her frequent migraine headaches, Ms. Dunlap alleges that she can no longer perform substantial gainful activity. *See* [#12-2 at 16, 35; #12-6 at 150–151, 172, 173, 188–189].

Ms. Dunlap's application was denied at the initial determination stage on April 5, 2013. [#12-2 at 14; #12-3 at 73; #12-4 at 78–80]. On May 15, 2013, Ms. Dunlap requested a hearing before an Administrative Law Judge. [#12-4 at 81–83]. Administrative Law Judge Mark R. Dawson ("ALJ") held a hearing on March 3, 2014, [#12-2 at 14, 34], at which attorney James Reed represented Ms. Dunlap. [*Id.* at 87; #12-4 at 75–77, 127].

At the hearing, Ms. Dunlap testified that her primary reasons for not working were her migraine headaches and her bipolar disorder, in addition to "several other factors as well." [#12-

2 at 35].   Regarding her migraines, Ms. Dunlap testified that she suffers from "at least two a week,"[5] with the longest lasting four days.   [*Id.* at 37–38].   She continued that she is very sensitive to light, which is one of her main migraine triggers, and that her migraines interfere with her ability to perform daily tasks.   [*Id.* at 37, 44].   Specifically, Ms. Dunlap explained that her husband and 29 year-old daughter handle the grocery shopping, and when she is "down with a migraine or something," her daughter does all the "heavy things in the house," which includes caring for Ms. Dunlap's 5 year-old granddaughter and 3 year-old grandson.   [*Id.* at 44, 50].   In response to the ALJ's question regarding Ms. Dunlap's absences from work because of migraine issues, Ms. Dunlap responded, "I was missing probably about 10 days a month [as a Home Health Care CNA].   When I was working in the hospital environment . . ., I actually had to quit working there because I was calling out too much, . . . two to three times a month."   [*Id.* at 54].

As to treatment for her migraines, Ms. Dunlap testified that she has visited six different neurologists, with the most recent neurologist prescribing the preventative medication Verapamil, [*Id.* at 36]; however, no diagnostic examinations have revealed any abnormalities. [*Id.* at 52].   Ms. Dunlap testified further that she frequents her "Family Medical Clinic" for Demerol and Phenergan injections to ease her pain, and that she seeks intravenous pain medication from the ER at least "one or two times a week, sometimes more."   [*Id.* at 36].   She testified that these treatments provide a few days of relief; however, her most recent treatment provided only four hours of relief before she "had to go get something else."   [*Id.* at 38].

With respect to her other ailments, Ms. Dunlap testified that her bipolar disorder "affects her brain," and that she experiences "depressive cycles" approximately three to four days a week

---

[5] Ms. Dunlap's initial answer as to the frequency of her migraines was "all the time."   [#12-2 at 37].

and will not leave her home during these cycles. [*Id.* at 39, 50–51]. She also testified about her weight gain since 2008 after losing nearly 200 pounds, following her 2002 gastric bypass surgery, [*Id.* at 40–42], as well as her foot, knee, back, and neck issues—all of which contribute to her present state of disability. [*Id.* at 45–48]. Because of her physical and mental ailments, Ms. Dunlap testified that she could no longer hike and climb mountains, or exercise at the gym or, more importantly, continue her work as a CNA. [*Id.* at 44–45, 51]. Similarly, Ms. Dunlap testified that her current impairments negatively affect her balance, allow her to sit for only thirty minutes before standing, and limit her walking to "a couple blocks." [*Id.* at 47–49].

Martin Rauer, a Vocational Expert ("VE"), testified at the hearing. [*Id.* at 55–58]. The VE testified that Ms. Dunlap's past job experience included a nurse aide, a specific vocational preparation ("SVP")[6] level four medium exertion job; a recruiter, an SVP level six sedentary job; a receptionist (a temporary position), an SVP level four sedentary job; a secretary, an SVP level six sedentary job; and a home attendant, an SVP level three medium exertion job. [*Id.* at 55].[7] Both the ALJ and VE agreed that Ms. Dunlap could not perform her previous relevant work activities based on her current ailments. [*Id.* at 57].

---

[6] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003). SVP level 3-4 is associated with semi-skilled work. https://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html.

[7] The VE's characterizations of Ms. Dunlap's previous employment positions are based on listings in the Dictionary of Occupational Titles that are similar in nature to the positions Ms. Dunlap listed in her work history report, [#12-6 at 151–152, 158].

Accordingly, the ALJ directed a hypothetical to the VE based on the Disability Determination Services' ("DDS") evaluation to determine whether jobs existed in the national economy for a person who was:

1.   a person "closely approaching advanced age," with a high school education and some years of college,[8] and who had a similar work background as Plaintiff;

2.   a person who can perform a limited range of light work activity;

3.   a person who has a moderate limitation in the ability to concentrate, which precludes semi-skilled or skilled work activity;

4.   a person who has a moderate social impairment, which precludes work in which public interaction is a primary component; and

5.   a person who has a moderate decompensation impairment, which causes her to miss up to one workday per month.

[*Id.* at 56].  The VE testified that positions "typically void of significant public contact" include a small products assembler, a machine operator, as well as an electronics worker—all of which are SVP level two light jobs.  [*Id.* at 57].  The ALJ then asked what amount of absenteeism would preclude full-time, long-term employment, to which the VE responded, "My break point is usually at about one and a half days per month. Two at the most would no longer be acceptable by most employers for maintaining employment."  [*Id.* at 58].  Neither the ALJ, nor Mr. Reed questioned the VE further.  [*Id.* at 58].

The ALJ issued his written decision on March 24, 2014.  [*Id.* at 14–27].  The ALJ concluded that Ms. Dunlap last met insured status requirements for DIB on March 31, 2013, that

---

[8] While the Administrative Record indicates that Ms. Dunlap also completed two years of college, no other evidence in the Record elaborates on this fact.  [#12-6 at 151].

she did not engage in substantial gainful activity during the period under review, and that she had seven severe impairments. [*Id.* at 16]. Further, the ALJ found that Plaintiff had the RFC to perform light work, with the limitations included in the hypothetical to the VE at the hearing, and that jobs existed in significant numbers in the national economy that Plaintiff could perform. [*Id.* at 18, 26]. For this reason, the ALJ denied Ms. Dunlap's application. [*Id.* at 26–27].

Ms. Dunlap requested a review of the ALJ's decision, which the Appeals Council denied on July 29, 2015. [*Id.* at 1–5]. The ALJ's order thus became the final decision of the Commissioner. 20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted). Ms. Dunlap filed this action on September 28, 2015, [#1], invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

### STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole. *Angel v. Barnhart,* 329 F.3d 1208, 1209 (10th Cir. 2003); *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted). The court may not reverse an ALJ simply because it may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in his decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart,* 395 F.3d 1168, 1172 (10th Cir. 2005)). "It requires more than a scintilla, but less than a preponderance." *Id.* Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992)

(citation omitted).   "[The court will] not reweigh the evidence or retry the case, [but must] 'meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met.'" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quoting *Grogan v. Barnhart,* 399 F.3d 1257, 1262 (10th Cir. 2005)).  Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (citation omitted).

## ANALYSIS

### I.    The ALJ's Decision

An individual is eligible for DIB benefits under the Act if she meets the insured status requirements, has not attained retirement age, has filed an application, and is under a disability. 42 U.S.C. § 423(a)(1).  A disability is "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or…last[s] for a continuous period of not less than 12 months…" § 423(d)(1)(A). An individual is determined to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…" § 423(d)(2)(A).

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act.  20 C.F.R. § 404.1520(a)(4).  *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.  Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied. *Id.*  Step

two considers whether the claimant has a medically severe impairment or combination of impairments, as governed by the Secretary's severity regulations. *Id.* If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, she is not eligible for disability benefits. *Id.* at 751. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three. *Id.* Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d). *Id.* (quoting *Bowen v. Yuckert*, 107 S. Ct. 2287, 2291 (1987)). At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite [his] impairments: the claimant's maximum sustained work capability." *Id.* The ALJ then compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, No. 14-1341, 2015 WL 3775669, at *2 (10th Cir. June 18, 2015) (internal quotation marks omitted) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (noting that the step-four analysis includes three phases: (1) "evaluat[ing] a claimant's physical and mental [RFC]"; (2) "determin[ing] the physical and mental demands of the claimant's past relevant work"; and (3) assessing "whether the claimant has the ability to meet the job demands found in phase two despite the [RFC] found in phase one.")). "If the claimant is able to perform his previous work, he is not disabled." *Williams*, 844 F.2d at 751. "The claimant bears the burden of proof through step four of the analysis." *Nielson*, 992 F.2d at 1120.

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Id.*

> A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy.

*Williams*, 844 F.2d at 751-52 (footnotes omitted).   Next, the ALJ determines the claimant's "RFC category" by assessing the claimant's physical abilities as well as his exertional limitations.   *See id.* at 752.   Additionally, the ALJ considers the claimant's nonexertional limitations, *i.e.*, sensory and mental impairments that may affect the claimant's ability to perform work-related tasks.   *Id.*   If the ALJ concludes that the claimant is not disabled based on these considerations, "this means that a significant number of jobs exist in the national economy for which the claimant" is able to perform.   *Id.*

The ALJ found Ms. Dunlap was insured for DIB through March 31, 2013.  [#12-2 at 16]. Next, following the five-step evaluation process, the ALJ determined that Ms. Dunlap had not engaged in substantial gainful activity since her alleged on-set date of January 1, 2011.[9]  [*Id.*]. At step two, the ALJ determined Ms. Dunlap had the following severe impairments: obesity status post remote bariatric surgery; migraines; status post right knee replacement; status post remote tarsal tunnel release; affective disorder; lumbar spondylosis; and anxiety disorder.  [*Id.*]. At step three, the ALJ determined that Ms. Dunlap did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title

---

[9] In formulating his RFC assessment, the ALJ writes, "treatment notes, as discussed above, show that the claimant was attempting to obtain work in the medical field after her alleged onset of disability."  [#12-2 at 24].

20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). [*Id.* at 16–18]. At step four, the ALJ found that Ms. Dunlap had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b), with additional limitations, [*Id.* at 18], and was unable to perform any of her past relevant work, [*Id.* at 26]. At step five, considering Ms. Dunlap's age, education, work experience, and RFC, the ALJ found there are jobs that exist in significant numbers in the national economy that Ms. Dunlap can perform. [*Id.* at 26–27].

Ms. Dunlap raises various challenges to the ALJ's decision: (1) the ALJ's step three analysis is flawed for failing to analyze her migraines pursuant to Listing 11.03; (2) the ALJ's RFC assessment is not supported by substantial evidence, as it does not properly account for her migraine-related limitations; (3) the ALJ's RFC assessment is not based on any medical opinion; and (4) the ALJ's RFC assessment is based on the ALJ's own interpretation of the raw medical data. [#18 at 4, 6, 10, 12]. Because Ms. Dunlap's first challenge necessitates remand, the court focuses on it.

## II.    Step Three of the Evaluation Process

Having found a claimant to have at least one severe impairment at step two, *see* 20 C.F.R. § 416.920(a)(4)(ii), step three of the evaluation process requires the ALJ to consider whether a claimant has an impairment that meets or medically equals any listing found at 20 C.F.R., Pt. 404, Subpt. P, App'x 1 (§§ 416.920(a)(4)(iii), 416.920(d); Listing of Impairments, 20 C.F.R. § 416.925). The Secretary of the Social Security Administration ("Secretary") acknowledges that the severity of the impairments found in these listings precludes any substantial gainful activity. *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Williams*, 844 F.2d at 751. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525 (c)(3). A claimant meets a listed impairment if the

claimant's ailments satisfy all of the listing's criteria, *id.*; however, a claimant's ailments may also medically equal a listing if the ailments are "at least equal in severity and duration to the criteria of any listed impairment," 20 C.F.R. §§ 416.926(a), 404.1526(a).  *See generally Davidson v. Sec'y of Health and Human Servs.*, 912 F.2d 1246, 1251–1252 (10th Cir. 1990) (per curiam) (explaining that the Secretary's regulation regarding medical equivalence was promulgated "[b]ecause the listings could not possibly include every physical impairment severe enough to prevent the claimant from any gainful activity") (internal quotations and citation omitted).  If the claimant meets or medically equals a listing, a conclusion of disabled is required and the claimant is entitled to benefits. *See id.* at 1252.

Here, Ms. Dunlap challenges the ALJ's analysis at step three.  [#18 at 6].  Specifically, Ms. Dunlap alleges that because the ALJ found her to have the severe impairment of migraines at step two, the ALJ was required to evaluate this impairment under Listing 11.03 Epilepsy— nonconvulsive.  [*Id.*].  Conversely, the Commissioner argues that the ALJ permissibly found that none of Ms. Dunlap's severe impairments met or medically equaled a listing because it was Plaintiff's responsibility to establish disability under 11.03.  [#19 at 9].  Because the court agrees with Ms. Dunlap, the decision of the Commissioner is remanded for further proceedings.

A.    Ms. Dunlap's History of Migraines

As discussed, Ms. Dunlap testified at the March 3, 2014, hearing that her migraines and bipolar disease were the primary factors for her inability to perform substantial gainful activity. [#12-2 at 35].  In her February 12, 2013, personal pain questionnaire, Ms. Dunlap indicated that she experience migraines three to five times per month, with the pain lasting until she "ha[s] the injection [Demerol and Phenergan] to clear it or am able to get it under control by myself." [#12-6 at 170].  Similarly, on her headache questionnaire, she indicated that her severe

headaches began when she was 23 years old, that she experiences such headaches three to five times per month, lasting one to five days, and that she experienced ten migraines between December 16, 2012, and February 12, 2013. [*Id.* at 171]. Further, when she is afflicted with a migraine, she alleged that she cannot "do anything until [she] get[s] a shot of pain medication," [*id.* at 172], as conservative treatments such as "heat, over-the-counter medication, [and] resting in a dark room" provide minimal relief. [*Id.* at 170].

Ms. Dunlap's medical records indicate that she was diagnosed with migraine headaches as early as 2005. *See, e.g.*, [#12-12 at 807–810 (Family Medicine Clinic, PC treatment notes from July 2013 and January 2014, detailing Ms. Dunlap's past diagnoses, specifically "Migraine without aura 12/30/2005."]. Moreover, treatment records from the relevant period under review, January 1, 2011 to March 31, 2013, reveal that Ms. Dunlap's migraines were a significant source of pain and discomfort. For example, in 2011, Ms. Dunlap frequently reported to her psychiatrist, Dr. Kenneth Krause, that she was experiencing migraines. *See, e.g.*, [#12-7 at 201 (1/3/11, reporting migraines three times per week), 202 (1/24/11, reporting migraines four times per week), 203 (5/9/11, "OK except for HAs [headaches]"), 204 (6/1/11, reporting migraines approximately once per week), 206 (11/1/11, "still has migraines")].

Then, between January 2012 and January 2013, Dr. Palmer treated Ms. Dunlap on nine separate occasions for severe migraines that had occurred several days before she sought treatment. *See generally* [#12-9 at 359 (listing the sixteen encounters Dr. Palmer had with Ms. Dunlap between January 2012 and January 2013, nine of which were to treat Ms. Dunlap for migraines]. On January 11, 2012, Plaintiff presented to Dr. Palmer's office for a follow-up on her previous migraine, as well as complaining of insomnia. [*Id.* at 388–389]. Dr. Palmer diagnosed Plaintiff with migraine no other symptoms ("NOS") without status migrainous (a

migraine lasting longer than 72 hours) and continued Plaintiff on her daily dose of Propranolol and, for her insomnia, Dr. Palmer prescribed Plaintiff Ambien. [*Id.*]. Seventeen days later, Ms. Dunlap returned, complaining of a migraine headache with symptoms of headache, photophobia, phonophobia, and nausea, which began four days earlier. [*Id.* at 386–387]. Dr. Palmer reported that Plaintiff was in acute distress and sitting in a "dark room with her hands over her face when [she] walked in." [*Id.*]. Dr. Palmer diagnosed Plaintiff with migraine NEC[10] with migraine with status migrainous, and Plaintiff received both Demerol and Phenergan injections. [*Id.*]. Ms. Dunlap returned again on April 9, 2012, seeking treatment for her migraine headache with symptoms of headache, photophobia, phonophobia, and nausea, and again received Demerol and Phenergan injections. [*Id.* at 382–383 (diagnosing Plaintiff with migraine NOS without migraine without status migrainous)]. Ms. Dunlap presented to Dr. Palmer's office another six times in 2012, complaining of severe migraines that had been lasting for a several days with similar symptoms of headache, photophobia, phonophobia, and nausea. *See* [*Id.* at 380–381 (5/5/12, diagnosed with migraine NOS without status migrainous and prescribed Topomax), 378–379 (5/30/12, diagnosed with migraine NEC without status migrainous, and referred to a pain specialist), 374–375 (7/13/12, diagnosed with migraine NOS without status migrainous and administered Demerol injection in addition to prescription for Demerol solution), 365–366 (11/14/12, diagnosed with migraine NOS without status migrainous and administered Demerol and Phenergan injections), 363–364 (12/10/12, same), 360–361 (1/16/13, migraine lasting five days with vomiting, diagnosed with migraine NEC without status migrainous and administered

---

[10] NEC stands for "not elsewhere classified," and may be selected when specific information is documented for the diagnosis, but no ICD-9-CM code exists to report. *See 2014 ICD-9-CM Diagnosis Codes*, http://www.icd9data.com/2014/Volume1/320-389/340-349/346/default.htm (under "Other Disorders of the Central Nervous System 340-349").

Demerol and Phenergan injections in addition to prescriptions for Demerol and Phenergan solutions)].

Similarly, in 2013 and 2014, Ms. Dunlap sought repeated treatment at both Dr. Palmer's office and Littleton Adventist Hospital for her recurring migraines with associated symptoms of nausea, vomiting, photophobia, phonophobia, prodrome, and aura. *See, e.g.*, [#12-12 at 721–722 (February 20, 2013), 855–856 (June 15, 2013), 850–851 (July 10, 2013), 818–819 (August 1, 2013), 820–821 (August 6, 2013), 827–828 (September 11, 2013); #12-11 at 659–660 (October 1, 2013); #12-12 at 867 (October 11, 2013), 694–697 (November 5, 2013); #12-11 at 675–676 (December 30, 2013), 674 (January 2, 2014); #12-12 at 809–810 (January 7, 2014); #12-11 at 599–600 (January 11, 2014), 667 (January 28, 2014), 608 (February 6, 2014), 668 (February 11, 2014)].   Because of her persistent migraines, Plaintiff underwent CT scans of her brain on January 11, 2014, and on February 6, 2014.   *See* [#12-11 at 625 (detailing the results of Plaintiff's January 11, 2014, CT scan), 608–612 (detailing the results of Plaintiff's February 6, 2014, CT scan)].   Although the results reported no abnormalities, a neurologist's report dated February 19, 2014, indicated that Ms. Dunlap continues to suffer from reoccurring migraines, that she should discontinue the use of Demerol and instead be prescribed Verapamil, and that she should consider receiving botox injections to relive her pain. *See* [#12-12 at 707–710].

Ms. Dunlap also testified that she had to resign from her last job as a Hospital Heath Care CNA due to the severity and frequency of her migraines because she was missing two to three days of work per month, out of three twelve-hour shifts per week. *See* [#12-2 at 54].

B.      The ALJ's Step Three Analysis

Pursuant to Social Security Ruling ("SSR") 96-6p, the ALJ is responsible for the legal question of whether a listing is met or medically equaled.  Conversely, it is the claimant's burden to establish disability under the Listings.  *See Bernal v. Bowen*, 851 F.2d 297, 300 (10th Cir. 1988) (holding that the claimant failed to establish that his depression met or medically equaled depressive syndrome under Listing 12.04).  In his decision, the ALJ concluded, *inter alia*, that Ms. Dunlap had a severe impairment of migraines.  [#12-2 at 16].  At step three, however, the ALJ found that none of Ms. Dunlap's impairments or combination of impairments met or medically equaled a listing.  [*Id.*].  Specifically, the ALJ concluded, "[w]hile the claimant also alleges a history of severe headaches, headaches are not specifically included in the Listing of Impairments in the Regulations.  Accordingly, the claimant's allegations of severe headaches neither meet not equal a listing."  [*Id.* at 17].  Upon review of the evidentiary record, this court finds that the ALJ's mischaracterization of Ms. Dunlap's severe impairment as "severe headaches," rather than migraines, and failure to consider whether her migraines (or the attendant physical and mental symptoms) met or equaled a listing for non-convulsive epilepsy under step three was in error, and was not harmless.  *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (remanding an ALJ's decision that Plaintiff was not disabled because the court could not "assess whether relevant evidence adequately support[ed] the ALJ's conclusion that appellant's impairments did not meet or equal any Listed Impairment, [or] whether he applied the correct legal standards to arrive at that conclusion."); *cf. Fischer-Ross v. Barnhart*, 431 F.3d 729, 730 (10th Cir. 2005) (holding an ALJ's factually substantiated findings at step four and five of the evaluation process, rendered his "terse" step three conclusion harmless error).

In reaching his conclusion in step 3, the ALJ initially explained that no treating or examining physician reported findings equivalent in severity of any listed impairment, nor had Ms. Dunlap's attorney ever asserted that she met or equaled a specific listing.  [#12-2 at 16]. The ALJ continued that he considered the claimant's physical impairments under Listings 1.02 (Major dysfunction of a joint(s) due to any cause), 1.04 (Disorders of the spine), and 11.14 (Peripheral neuropathy), and her mental impairments under 12.04 (Affective Disorders) and 12.05 (Intellectual disability).  [*Id.* at 17].  Ms. Dunlap does not challenge the ALJ's conclusions as to these Listings.   However, though he found in step two that Ms. Dunlap's migraines constituted a severe impairment, the ALJ characterized those migraines as "severe headaches" in step 3.  [*Id.*].   Ms. Dunlap specifically challenges the ALJ's conclusory statement that her "severe headaches" do not meet or equal a listing, contending that because the ALJ found her *migraines* to be a severe impairment, the ALJ was required to consider the *migraines* pursuant to Listing 11.03.  [#18 at 5].

The court respectfully agrees, and finds that remand to the ALJ for further consideration at step 3 is appropriate.   An ALJ's step three conclusion "should discuss the evidence and explain why the ALJ found that the claimant was not disabled at that step."  *Dye v. Barnhart*, 180 F. App'x 27, 28 (10th Cir. 2006) (citing *Clifton*, 79 F.3d at 1009).  "[A]n ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton*, 79 F.3d at 1009–1010.  The ALJ's characterization of Ms. Dunlap's condition as one for "severe headaches" rather than migraines led him to conclude that because those headaches are not specifically included in the Listings, Ms. Dunlap's "severe headaches neither [met] nor equal[ed] a listing."  [#12-2 at 17]; *see also*

*Thomas v. Colvin*, 69 F.Supp.3d 1174, 1178 (D.Colo. 2014) (remanding an ALJ's denial of benefits for improperly evaluating Plaintiff's migraines at step three, noting "[a]lthough there is no separate listing for migraines, the Commissioner has stated that the most analogous listing is section 11.03, which sets forth criteria for non-convulsive epilepsy.").

On its face, the ALJ's conclusion that severe headaches were not specified in the Listings, [#12-2 at 17], at step three is not in error.  But as discussed above in detail, Ms. Dunlap's medical records include diagnoses of and treatment for migraines.  [#12-12 at 807–810 (Family Medicine Clinic, PC treatment notes from July 2013 and January 2014, detailing Ms. Dunlap's past diagnoses, specifically "Migraine without aura 12/30/2005."].  Ms. Dunlap's records consistently refer to her migraines, and there are numerous instances in the medical record that corroborate Ms. Dunlap's allegations regarding the severity, frequency, and debilitating symptoms associated with her migraines.  There is no explanation in the ALJ's determination as to why he chose to use "severe headaches" at step 3 instead of migraines.  Nor is there discussion of the reported severity, frequency, and debilitating symptoms associated with her migraines, regardless of what label is assigned to them.  [#12-2 at 17–18].

The ALJ was required to determine whether the specific impairment, *i.e.*, migraines, met or medically equaled a listing.  *See Lax*, 489 F.3d at 1085 (discussing step three of the evaluation process).  According to Agency policy, the most analogous listing for migraines is Listing 11.03. *See Thomas*, 69 F.Supp.3d at 1177; s*ee also* Empire Justice Center, SSA National Q&A 09–036 Migraines   (available   at   http://www.empirejustice.org/issue-areas/disability-benefits/rules--regulations/ssa-qa-09-036-migrains.html#.V-QbxvkrLcs)   (last accessed September 22, 2016) ("listing 11.03 … is still the most analogous listing for considering medical equivalence.") [hereinafter SSA National Q&A 09-036].  The criteria set forth in Listing 11.03 state:

nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 11.03.  In SSA National Q&A 09-036, the Agency clarified which "essential components of listing 11.03" may be most relevant when considering whether a claimant's migraine headaches meet or medically equal a listing.  These include:

1.  migraines "documented by detailed description of a typical headache event pattern, including all associated phenomena, [such as] premonitory symptoms, aura, duration, intensity, accompanying symptoms, and treatment;"

2.  migraines "occurring more frequently than once weekly;"

3.  migraines that "[alter] [] awareness;" however, "it is not necessary for a person with migraine headaches to have alteration of awareness as long as she has an effect . . . that *significantly* interferes with activity during the day," *e.g.*, resting in a darkened room, or lying down without moving.

SSA National Q&A 09-036 at 3–4 (quoting Listing 11.03).  The Agency also explained that a diagnosis of migraine headaches requires a detailed description by a physician of a typical headache event that includes the intensity, characteristics, and all associated phenomena of the headache.  *See id.* at 2.  Other "clinically accepted indicators of the diagnosis" include: headaches lasting 4 to 72 hours if untreated or treated unsuccessfully; headaches of a throbbing quality, with moderate or severe pain intensity, worsened by routine physical activity; or headaches with at least one symptom: nausea, vomiting, photophobia, or phonophobia.  *Id.* at 2–3.

Although the court is not permitted to reweigh the evidence or interpose its judgments for that of the ALJ, substantial evidence does not support the ALJ's use of "severe headaches" instead of migraines at step three.  *See Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004).  The ALJ did not evaluate Ms. Dunlap's migraines under 11.03 at step 3, nor did he analyze her medical history of migraines and attendant symptoms before concluding that her "severe headaches" did not meet or equal a listing.  *See, e.g.*, [#12-7 at 201–204 (Dr. Krause's treatment notes indicating that Plaintiff suffers from several migraines during the week); #12-9 at 360–389 (Dr. Palmer's treatment notes from January 2012 to January 2013, diagnosing Ms. Dunlap with varying degrees of migraines and noting symptoms of nausea, vomiting, photophobia, phonophia, and aura)].  Without discussion, the court is left with no understanding as to how the ALJ moved from step 2, where he determined Ms. Dunlap had a severe impairment of migraines, to substantively analyze Ms. Dunlap's severe impairment of migraines in step 3.

Authority and guidance from this District, lead this court to conclude that such error is grounds for remand.[11]  *See, e.g.*, *Thomas*, 69 F.Supp.3d at 1178–1179 (holding as reversible error the ALJ's failure to evaluate Plaintiff's migraines under Listing 11.03); *Butts v. Astrue*, No. 11–cv–01225–MSK, 2013 WL 490933, at *3–4 (D.Colo. February 6, 2013) (remanding an ALJ's decision because the ALJ did not consider Plaintiff's migraines under 11.03, and because

---

[11] Courts in other Districts also suggest that this failure at step three constitutes reversible error. *See, e.g.*, *Mann v. Colvin*, 100 F.Supp.3d 710, 720 (N.D.Iowa 2015) ("Having carefully reviewed the record, I find that there is sufficient evidence of chronic, severe migraine headaches during the relevant period of time that the ALJ must consider whether that impairment medically equals Listing 11.03."); *Edwards v. Colvin*, No. 3:14–cv–05338–KLS, 2014 WL 7156846, at *3 (W.D. Wash. December 15, 2014) (holding that the ALJ "erred in failing to indicate whether she specifically considered Listing 11.03 in determining plaintiff's migraine headaches did not medically equal the criteria of any listed impairment."); *Means v. Colvin*, No. 2:15-CV-01107-TFM, 2016 WL 3386814, at *6 (W.D. Pa. June 20, 2016) (remanding to the ALJ and advising the ALJ to "specifically address whether Plaintiff's migraines caused impairments similar to those described in Listing 11.03.").

"The ALJ gave no other analysis at Step 3 to support his legal conclusion that Ms. Butts' migraines were not equivalent to a Listing.").

The Commissioner argues that any error is harmless because the ALJ's findings at subsequent steps are supported by substantial evidence. [#19 at 10 (citing *Fischer-Ross*, 431 F.3d at 733)]. For the reasons discussed below, the court respectfully disagrees.

C.       The ALJ's Subsequent Determinations[12]

The Tenth Circuit in *Clifton v. Chater*, reversed an ALJ's denial of benefits because the ALJ did not substantiate his step three conclusion with substantial evidence. 79 F.3d 1007, 1008–1009 (10th Cir. 1996). The court continued that the ALJ's "summary conclusion that appellant's impairments did not meet or equal any Listed Impairment," without mention of what evidence or listings were considered, was "beyond meaningful judicial review." *Id.* at 1009. Therefore, the court remanded the case for further proceedings without considering the claimant's challenge to the ALJ's step five conclusion. *Id.* at 1010. However, in *Fischer-Ross v. Barnhart*, the Tenth Circuit refused to read *Clifton* to create a blanket rule, requiring remand any time the ALJ's step three conclusion was not supported by substantial evidence. 431 F.3d 729, 730 (10th Cir. 2005). Instead, the court held that an "ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment" even if that conclusion is

---

[12] Although Plaintiff raises numerous challenges to the ALJ's step four determination, specifically his RFC assessment, *see* [#18 at 6–17], the court will not specifically address those challenges given that the ALJ's error at step three necessitates remand. The court considers the ALJ's step four analysis for the limited purpose of explaining why the ALJ's step three error was not harmless. In addition, the court recognizes that the ALJ's reconsideration at step three may affect his analysis at step four and five and, therefore, the court does consider Plaintiff's arguments as to those determinations. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

not supported by substantial evidence.  *Id.* at 733.  The court concludes that this case is distinguishable from *Fischer-Ross*, as the ALJ's analysis at subsequent steps of the evaluation process does not render his error at step three harmless.

At step four of the evaluation process, the ALJ concluded that Ms. Dunlap could not perform her prior relevant work activities, and that she had the RFC to perform light work with certain limitations.  *See* [#12-2 at 18]; *see also* 20 C.F.R. § 404.1529(a)–(c) (requiring the ALJ to determine the extent to which a claimant's impairments limit her functional abilities to perform the category of work identified by the RFC).  These limitations included, moderate restrictions in her ability to concentrate and her ability to maintain social functioning and, most notably, that she would "miss one day of work per *month* secondary to her migraine headaches."  [#12-2 at 18 (emphasis added)].

The ALJ undertakes a comprehensive and thorough review of the medical record at this step, and his synopsis of the relevant evidence spans nearly six whole pages.  *See* [*Id.* at 18–24]. Upon completing his discussion of the medical evidence, the ALJ concluded "Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms;" however, the ALJ did not find her statements regarding the intensity, persistence, or limiting effects entirely credible.  [*Id.* at 24].  Explicitly, the ALJ concluded, "while the claimant suffers from significant migraine headaches on an episodic basis," her allegations regarding the frequency (three to five times per month) and duration (one to five days) were inconsistent with the medical evidence.  [*Id.*].  For example, the ALJ noted "significant gaps, such as three to four month[s]" where Plaintiff did not seek treatment at the ER or Dr. Palmer's office, that Plaintiff's function report alleged disability secondary to migraines while at the hearing she claimed migraines were the primary cause of her disability, and that Plaintiff was able to care for her

grandchildren. [*Id.*]. The ALJ also placed significant weight on the fact that none of the objective neurological exams reported any abnormalities. *See* [*Id.*]. Further, the ALJ accorded significant weight to the medical opinions of state agency psychiatrist, Dr. Baroffio, and state agency psychologist, Dr. Wanstrath, who found Plaintiff to have only moderate mental limitations. [*Id.* at 25].

Ultimately, the court cannot conclude that the ALJ's decision at this step was supported by substantial evidence. *See Grogan*, 399 F.3d at 1261–62 (holding that a decision is not supported by substantial evidence "if it is overwhelmed by other evidence in the record"). To start, an ALJ must not only discuss the evidence supporting his decision, but also any "uncontroverted or significantly probative" evidence he rejects. *See Wall*, 561 F.3d at 1075. Although the ALJ describes Ms. Dunlap's medical history in detail, he does not discuss what, if any, weight he accords this evidence. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) ("Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons in [the] notice of determination or decision for the weight assigned to a treating physician's opinion.") (internal quotations and citation omitted). Rather, the ALJ simply states that he does not credit Plaintiff's allegations because they are inconsistent with the medical records. However, there is an abundance of evidence in the record from Ms. Dunlap's treating doctors, detailing the severity, frequency, and adverse effects of Ms. Dunlap's migraines that the ALJ recites, but does not discuss any further. *See generally* [#12-9 at 360–389 (Dr. Palmer's treatment notes from 2012 to 2013, indicating nine separate trips for migraine treatment for migraines lasting several days, diagnosing the Plaintiff with migraines, detailing numerous associated symptoms, and reporting on prescribed and administered treatments during such visits)].

In addition, the ALJ discredited Ms. Dunlap's allegations because the objective neurological exams returned normal. [#12-2 at 25]. However, the "absence of unequivocal evidence of migraine headaches does not mean that [Ms. Dunlap] does not suffer from them, as there is no 'dipstick' laboratory test for such headaches." *Guinn v. Chater*, 83 F.3d 431 (Table), 1996 WL 211140, at *3 (10th Cir. April 30, 1996) (citing *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993) (holding that a lack of specific diagnostic tests for chronic fatigue syndrome did not mean there was no medical evidence of disability)). Moreover, the Tenth Circuit has provided guidance on this point, holding "[w]e are aware of no medical procedures to objectively evaluate either the severity of a migraine or pain; and where no such conclusive tests exist, the failure to produce such test results is surely an improper basis for discrediting a claimant's uncontroverted testimony." *See Pennington v. Chater*, 113 F.3d 1246 (Table), 1997 WL 297684, at *3 (10th Cir. 1997).

Next, the ALJ placed significant weight on the opinions of the state agency doctors, Dr. Baroffio and Dr. Wanswarth. *See* [#12-2 at 25]. The ALJ concluded that both opinions that Ms. Dunlap suffered from only moderate concentration impairments were consistent with the record as a whole. [*Id.*]. Further, the ALJ relied on Dr. Wanstrath's evaluation of Ms. Dunlap under Listings 12.04 (Affective Disorders), 12.06 (Anxiety Disorders), and 12.08 (Personality Disorders), concluding that in addition to Plaintiff's migraines, the evidence does not support a greater limitation than "moderate." [*Id.*; #12-3 at 67 (Dr. Wanstrath's examination)]. Although both state agency opinions reference Ms. Dunlap's migraines, neither undertakes a specific examination of how this impairment interferes with her ability to perform substantial gainful activity. *See* [#12-3 at 65–66; #12-9 at 404 (Dr. Baroffio's examination, providing "commentary on the patient's ability to *manage funds*.") (emphasis added)]; *see also Thomas*, 69 F.Supp.3d at

1178 ("[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.") (quoting SSR 96-6p, 1996 WL 374180 at *3 (SSA July 2, 1996)).  For these reasons, the court cannot conclude that the ALJ's analysis at step four is supported by substantial evidence thus rendering his error at step three harmless.  *See Clifton*, 79 F.3d at 1009–09; *see also Hua v. Astrue*, No. 07–cv–02249–WYD, 2009 WL 524991, at *3 (D.Colo. March 2, 2009) (holding as error the ALJ's determination that medical evidence did not support a diagnosis of migraines due to a lack diagnostic tests when such "headaches [were] documented in almost every medical record and at almost every medical appointment/treatment.").

## CONCLUSION

The court concludes that the ALJ committed reversible error at step three of the five-step evaluation process, and that this error was not rendered harmless by the ALJ's analysis at subsequent steps.  Accordingly, **IT IS ORDERED** that the Commissioner's final decision is **REVERSED** and this civil action is **REMANDED** for further proceedings.


DATED: September 28, 2016              BY THE COURT:

                                      s/Nina Y. Wang
                                      Nina Y. Wang
                                      United States Magistrate Judge